UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SANDRA BETH SCHWARCZ,

      Plaintiff,

v.                                      Case No: 6:25-cv-640-JSS-RMN

WALT DISNEY PARKS AND
RESORTS U.S., INC.,

      Defendant.

_____/

### ORDER

Defendant moves for summary judgment. (Dkt. 33; *see* Dkt. 39.) Plaintiff opposes the motion. (Dkt. 37.) Upon consideration, for the reasons outlined below, the court denies the motion.

### BACKGROUND[1]

Plaintiff has had permanent disabilities since 2012. (Dkt. 38-1 ¶ 2.) She suffers from mast cell activation syndrome (MCAS) and postural orthostatic tachycardia syndrome (POTS) and also requires an electric convenience vehicle (ECV), or mobility scooter, to move from place to place. (*Id.* ¶¶ 2, 4.) MCAS "makes [Plaintiff] hyper-allergic." (*Id.* ¶ 4.) Plaintiff defines POTS as "a neurological condition affecting the control of the autonomic nervous system[,] including regulation of pulse and blood pressure," and she explains that POTS can cause her "heart to beat faster than normal" when she "transition[s] from lying to sitting or sitting to standing up or maintain[s] an

---

[1] In setting forth the background facts, the court views the evidence in the light most favorable to Plaintiff as the non-moving party on summary judgment and accordingly credits Plaintiff's version of events as supported by the evidence. *See Underwood v. City of Bessemer*, 11 F.4th 1317, 1327 (11th Cir. 2021).

upright posture." (*Id.* ¶ 2.)  According to Plaintiff, "POTS is exacerbated by warm or hot temperatures and, as such, requires that [she] recover in a cool temperature following any physical activity." (*Id.* ¶ 3.)

Plaintiff has visited Defendant's Yacht Club Resort in the Orlando, Florida area "two to three times a year since 2009." (*Id.* ¶ 5.)  Starting in 2016, Plaintiff would contact the resort before each visit to "review [her] needs for accommodations," and "[f]or years," the resort's employees would "work[] with [her] to accommodate [her] needs so that [she] could enjoy" Defendant's facilities to the fullest.  (*Id.* ¶ 6.) However, on October 29, 2022, Plaintiff discovered upon arrival that "the necessary adjustments had not been made to the thermostat in [her] room." (*Id.* ¶ 8.)  When Plaintiff "requested a technician to make the appropriate changes," the manager on duty told her that the room could not reach the lower temperature, even though Plaintiff had stayed in the same room before and the temperature had then been lowered at her request.  (*Id.* ¶¶ 8–9.)  Plaintiff states that the manager "provided incredulous reasons" for not changing the temperature, including that Defendant had implemented an environmental initiative and "was not going to make any further accommodations and if they were needed, guests would be told to go elsewhere." (*Id.* ¶ 10.)  According to Plaintiff, the manager "concluded by telling [her] that if [she] did not like the temperature in the room, [she] was free to leave the hotel and never return." (*Id.* ¶ 11; *accord* Dkt. 38-2 at 1 (showing a message to the manager from Plaintiff stating: "You[] said [that] I could accept the temperature or not stay at the hotel and that I can return home.").)  Because the room temperature had not been

adjusted, Plaintiff awoke the next morning "well before [her] alarm was set to go off, with dizziness, shortness of breath, and [her] heart racing in the 140s."  (Dkt. 38-1 ¶ 12; *accord* Dkt. 38-3 at 1, 3.)  Plaintiff called Defendant's attention to her medical condition, and Defendant responded by adjusting the room temperature.  (Dkt. 38-1 ¶ 13.)

In April 2023, someone claiming to be a representative of Defendant contacted Plaintiff and indicated that the representative would discuss the room temperature accommodation with the resort's general manager.  (*Id.* ¶ 15.)  The representative "promise[d] to respond the next day."  (*Id.* ¶ 16.)  However, she did not, so "nearly a week" later, Plaintiff "followed up with an email on May 12, 2023."  (*Id.*)  The representative responded via email that evening; the email stated that the representative had spoken with the resort directly and had noted Plaintiff's room temperature requests on her booking but could not guarantee a temperature adjustment.  (*Id.*; Dkt. 38-4 at 1.)  Plaintiff reports that "[l]ess than [twenty] minutes later[,] [she] responded asking for a phone call as had been promised," and "[r]eceiving no response, [she] immediately called the main lobby office" for the resort.  (Dkt. 38-1 ¶ 17.)  The resort employee with whom Plaintiff spoke had not heard from the representative, had not heard of the department to which the representative claimed to belong, and "did not see any notations on [Plaintiff's] booking regarding the air conditioning."  (*Id.* ¶ 18.)  According to Plaintiff, she was "deeply concern[ed]" because "it was clear [to her] that [she] had been lied to by someone unknown to the [resort] and there were no assurances" that Defendant would provide the room

- 3 -

temperature accommodation even though she had mere "days before [her] scheduled departure." (*Id.* ¶ 19.)

When Plaintiff arrived at the resort from Pennsylvania on May 17, 2023, she discovered that the room temperature accommodation had not been provided. (*Id.* ¶ 20.) Plaintiff "made approximately six requests of lobby personnel to have someone adjust the air conditioner" and "was eventually told that no one was being sent as the air conditioning had been adjusted." (*Id.* ¶ 21.) A record from Defendant for May 15, 2023, states: "We are contacting the resort and getting the engineer to adjust [Plaintiff's] room so her [air conditioning] *does turn off* while she is at [one of Defendant's theme] park[s]." (Dkt. 33-1 at 39 (emphasis modified).) Plaintiff contacted the manager on duty to explain the situation, and "[a]pproximately three hours after [her] arrival," she was told that someone was being sent to her room. (Dkt. 38-1 ¶ 22.) At that point, "[a]n electrician arrived simply to tell [Plaintiff] that all the air conditioner technicians had called out sick" so "no one was available to make the necessary adjustments to the air conditioner." (*Id.* ¶ 23.) Plaintiff explained to the electrician that she had "observed many times" the "relatively simple" process of "overriding the thermostat" to adjust the temperature, and "[w]ith this explanation, the electrician eventually agreed to make the override." (*Id.* ¶ 24.)

Plaintiff notes that throughout her May 2023 visit to the resort, unlike during prior visits, various resort employees followed her. (*Id.* ¶ 25.) Resort employees were also less willing to assist Plaintiff than they had been before and did not treat her as well as they had before. (*Id.* ¶ 26.) Plaintiff had eaten at the resort's steakhouse many

times without a problem, but during the May 2023 visit, she was initially prohibited from bringing her ECV into the restaurant. (*Id.* ¶ 27.) The hostess three times instructed Plaintiff to leave the ECV outside. (*Id.*) Plaintiff then spoke with the manager, who initially refused her ECV request but ultimately "agreed to seat [her] in a cordoned off part of the restaurant." (*Id.*) Further, when parking on May 26, 2023, Plaintiff asked a valet for parking options given that "there were no handicapped parking spots remaining," and instead of providing Plaintiff with parking options, the valet spoke with a manager who then came outside to keep "eyes on [Plaintiff's] party" of guests. (*Id.* ¶ 28; *see* Dkt. 38-6 at 1 (a record from Defendant indicating that the "[v]alet ask[ed] for eyes on the . . . party" because of where the party asked to park).)

At Defendant's Animal Kingdom theme park, a large bird in a bird show expelled its waste on Plaintiff to the extent that Plaintiff needed to wash her clothes. (Dkt. 38-1 ¶ 29.) Plaintiff asked to use a washing machine in one of Defendant's vacant timeshare properties because her allergies, exacerbated by MCAS, prevented her from using a laundromat instead. (*Id.*) Defendant initially denied her requests, stating that no rooms were available. (*Id.*) However, a Yacht Club Resort manager ultimately permitted Plaintiff to wash her clothes. (*Id.*)

In the evening of May 26, 2023, Plaintiff attempted to access the resort's Club Level (a level of exclusive access available to Defendant's guests for a fee) and was denied entry. (*Id.* ¶ 30; *see* Dkt. 38-6 at 1 (a record from Defendant emphasizing that Plaintiff was not to be granted Club Access).) Plaintiff states: "With more than twenty minutes before the Club Level closed, I went to the lobby desk and asked [the

- 5 -

employees there] to fix my room card to allow for access to the Club Level as I had paid for that service." (Dkt. 38-1 ¶ 30.) Defendant denied the request multiple times until a manager "agreed that access should be granted and then escorted" Plaintiff's party to the Club Level. (*Id.* ¶ 31.) On the way, the manager stated that employees had been instructed "to leave the food out and to bring some other items out." (*Id.* ¶ 32.) Nonetheless, Plaintiff reports, "[u]pon arrival, . . . nearly all the food was put away." (*Id.*) When Plaintiff asked about the food situation, an employee informed her that contrary to the manager's statement, no instruction to leave the food out had been given. (*Id.* ¶ 33.) At that point, Plaintiff considered leaving the resort and drove with her mother to explore Defendant's Animal Kingdom Lodge as an alternative hotel. (*Id.* ¶ 34.) However, concerns about the lodge's ability to accommodate her medical conditions prompted Plaintiff to remain at Yacht Club Resort. (*Id.*)

On May 27, 2023, Plaintiff informed a manager at the resort about the difficulties that Plaintiff had encountered in receiving accommodations and about Plaintiff's "perception—and discomfort—of being followed and watched by staff" at the resort. (*Id.* ¶ 35.) The manager "confirmed [Plaintiff's] perception of being followed and watched" and indicated that Defendant had declined in quality. (*Id.* ¶ 36; *see* Dkt. 38-10 at 36 (the manager's deposition testimony acknowledging that the manager could have told Plaintiff that Defendant had changed).) A few hours later, law enforcement issued a trespass warning to Plaintiff and advised her that Defendant was banning her from its properties. (Dkt. 38-1 ¶ 37.) When Plaintiff asked for the reason for the ban, a manager informed her that Defendant implemented the ban due

to her "conduct during this visit and previous visits." (*Id.* ¶ 38.) Months later, through her efforts to remove the trespass warning, Plaintiff learned that someone had falsely accused her of putting her hand on the shoulder of an employee at the resort's Club Level. (*Id.* ¶ 39.) Plaintiff explains: "I have a well-documented history of disallowing any contact with others due to my allergies. I would never be physically aggressive towards anyone, risking my allergies and jeopardize not only my ability to return to [Defendant's theme] parks but to uphold my future license to practice medicine." (*Id.* ¶ 40.)

Defendant uses a four-level system to categorize its significant guests. (*See* Dkt. 38-8 at 1; Dkt. 38-9 at 1; Dkt. 38-11 at 13.) High-ranking government officials, titans of industry, celebrities, and executives for Defendant belong to the first, VIP-1 level. (*See* Dkt. 38-8 at 1; Dkt. 38-9 at 1; Dkt. 38-11 at 13.) Celebrities, government officials, and executives of lesser rank belong to the second, VIP-2 level. (*See* Dkt. 38-8 at 1; Dkt. 38-9 at 1; Dkt. 38-11 at 13.) The third, VIP-3 level includes repeat guests with complimentary stays, couples getting married on Defendant's properties, and other guests whom Defendant prioritizes above the average guest. (*See* Dkt. 38-8 at 1; Dkt. 38-9 at 1; Dkt. 38-11 at 13.) The guests in the fourth, VIP-4 level are officially described as "special attention guests" but in fact consist of problem guests with histories of "excessive demands for compensation," unpaid balances, "aggressive behavior, aggressive language, [and] excessive amounts of time taken from resort leadership." (Dkt. 38-11 at 13–14; *see* Dkt. 38-8 at 1; Dkt. 38-9 at 1.) The decision to place a guest in the VIP-4 level involves collaboration among "[t]he resort operations team, project

- 7 -

management, a few . . . resort executives, and . . . the legal department." (Dkt. 38-11 at 16.) Defendant's records show that it classified Plaintiff as a VIP-3 guest on May 13 and 14, 2023 (before her May 2023 stay), but as a VIP-4 guest on May 26 and 27, 2023 (at the end of her stay). (Dkt. 38-8 at 1; Dkt. 38-9 at 1.) Plaintiff asserts that Defendant reclassified her as a VIP-4 guest because she requested accommodations for her disabilities during her stay. (Dkt. 38 at 11.)

Dissatisfied with Defendant's alleged mistreatment, Plaintiff initiated this case on April 10, 2025, by filing a two-count complaint under the Americans with Disabilities Act (ADA). (Dkt. 1.) Plaintiff sues Defendant for discrimination (count one) and interference, coercion, or intimidation (count two). (*Id.* at 11–13.) She seeks declaratory and injunctive relief, including recission of the trespass, as well as reasonable attorney fees and other legal costs. (*Id.*) Defendant denies liability as to both counts. (Dkt. 19.) Discovery closed in this case on October 3, 2025. (Dkt. 15 at 1.) This case is set for a bench trial starting May 18, 2026. (*See* Dkt. 41 at 1; Dkt. 44.)

## APPLICABLE STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a party "assert[s] that a fact cannot be or is genuinely disputed," the party "must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . [by] showing that the materials cited do not establish the absence or presence of a genuine dispute[] or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court

- 8 -

need consider only the cited materials" when resolving the motion.  Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record." (quotation omitted)).

A factual dispute is "genuine" only if "a reasonable [factfinder] could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law.  *Id.*  The moving party bears the initial burden of identifying those portions of the record showing a lack of a genuine factual dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  If the movant shows that no evidence supports the non-moving party's case, the burden shifts to the non-moving party to show that there are, in fact, genuine factual disputes which preclude judgment as a matter of law.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact.  *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see also HRCC*, 703 F. App'x at 816–17 ("Presenting arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." (alteration

adopted) (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))). In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party and must resolve any reasonable doubts in that party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). The court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Summary judgment should be granted only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party." *Matsushita*, 475 U.S. at 587.

## ANALYSIS

The court addresses counts one and two in turn.

### A. Count One

Count one seeks declaratory and injunctive relief, including recession of the trespass, for Defendant's alleged discrimination against Plaintiff in violation of Title III of the ADA. (Dkt. 1 ¶¶ 64–66.) Title III provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). As relevant here, (*see* Dkt. 37 at 19–20), Title III generally prohibits denying disabled individuals opportunities "to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity" on the basis of the individuals' disabilities, as well as

- 10 -

giving disabled individuals opportunities to participate or benefit that are "not equal to" the opportunities "afforded to other individuals," 42 U.S.C. § 12182(b)(1)(A)(i)–(ii).  To succeed on a Title III claim, a plaintiff must satisfy three elements: (1) "the plaintiff is disabled," (2) "the defendant owns, leases, or operates a place of public accommodation," and (3) "the defendant denied the plaintiff—on the basis of the disability—full and equal enjoyment of the premises."  *Price v. City of Ocala*, 375 F. Supp. 3d 1264, 1269 (M.D. Fla. 2019) (quotation omitted).

For purposes of the instant motion, Defendant does not dispute the first or second element.  (Dkt. 33 at 17 n.13.)  Instead, Defendant maintains that Plaintiff cannot satisfy the third element because Defendant did not deny her access to its properties based on her disabilities but rather accommodated her and because the trespass was not based on her disabilities but on her own misconduct involving one of Defendant's employees.  (*Id.* at 18–21.)  Defendant also asserts that rescission of the trespass is not a reasonable accommodation because the trespass resulted from Plaintiff's own misconduct, not from her disabilities.  (*Id.* at 21–22.)  Plaintiff responds that Defendant denied her "the benefits of a room with a conditioned air temperature that permitted [her to] sleep" and denied her "access to a restaurant with an ECV . . . , access to the Club Level[,] and ultimately[,]" access to all of Defendant's properties through the trespass.  (Dkt. 37 at 20.)  Plaintiff also denies the misconduct asserted as the basis for the trespass and contends that the false accusations are pretextual and motivated by Defendant's desire to "no longer have to deal with accommodating" her. (*Id.* at 12–13.)

Regarding Title III discrimination, the Eleventh Circuit has explained:

> [T]he definition of discrimination provided in Title III covers both tangible barriers, that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services[,] and privileges, *see* 42 U.S.C. § 12182(b)(2)(A)(iv), and intangible barriers, such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the defendant entity's goods, services[,] and privileges, *see* 42 U.S.C. § 12182(b)(2)(A)(i)–(ii).

*Rendon v. Valleycrest Prods.*, 294 F.3d 1279, 1283 (11th Cir. 2002). In addition, Title III "recognizes that an intangible barrier may result as a consequence of a defendant entity's failure to act, that is, when it refuses to provide a reasonable auxiliary service that would permit the disabled to gain access to or use its goods and services." *Id.* n.7 (citing 42 U.S.C. § 12182(b)(2)(A)(iii)).

When viewed in the light most favorable to Plaintiff, with all reasonable inferences drawn in her favor, evidence permits a reasonable factfinder to conclude that Defendant denied her the full and equal enjoyment of its properties on the basis of her disabilities through tangible and intangible barriers covered under Title III. *See id.* at 1283 & n.7. For example, evidence supports that despite Defendant's prior knowledge of Plaintiff's air conditioning and mobility needs, Defendant initially denied her room temperature and ECV accommodations. (Dkt. 38-1 ¶¶ 5–6, 8–9, 20–24, 27; *see* Dkt. 33-1 at 39.) In addition, a reasonable factfinder could conclude that Defendant's asserted basis for the trespass is a pretext for discrimination and that Defendant wanted Plaintiff to leave its properties so that it was no longer required to accommodate her disabilities. Evidence supports that Defendant came to view

Plaintiff as a problem guest—prompting it to reclassify her from VIP-3 to VIP-4 level—during her May 2023 stay, when she made multiple requests for accommodation of her disabilities. (Dkt. 38-8 at 1; Dkt. 38-9 at 1; Dkt. 38-11 at 13–14, 16.) Evidence also supports that Defendant wanted Plaintiff to leave and took steps to make her uncomfortable. Plaintiff declared under penalty of perjury that during her October 2022 visit, a manager told her that "if [she] did not like the temperature in the room, [she] was free to leave the hotel and never return." (Dkt. 38-1 ¶ 11; *see* Dkt. 38-2 at 1.) Regarding the May 2023 visit, although Defendant claims that the "does turn off" record demonstrating its intent to turn off Plaintiff's air conditioning in her absence contrary to her medical needs is a clerical error that actually demonstrates the opposite intent through the inadvertent omission of the word "not," (Dkt. 39 at 2; *see* Dkt. 33-1 at 39), the court must view the record in Plaintiff's favor, *see Skop*, 485 F.3d at 1136, as indicating Defendant's animosity toward Plaintiff.

Moreover, according to Plaintiff, Defendant's employees followed and monitored her party in a way that caused her discomfort, and they did not assist her as much as they could. (Dkt. 38-1 ¶¶ 25–26, 35–36; *see id.* ¶ 29.) Evidence also supports that Defendant lied to Plaintiff: for example, her party was told to expect food at the Club Level that was not, in reality, there. (*Id.* ¶¶ 31–33.) Further, a reasonable factfinder could find pretext in discrepancies among the original reason given for banning Plaintiff from Defendant's properties (her conduct during not only the May 2023 visit but also prior visits), the primary basis for the trespass (Plaintiff's alleged touching of an employee), Plaintiff's prior VIP-3 status (suggesting that Defendant

- 13 -

previously prioritized her above the average guest), and Plaintiff's documented history of not touching others given her allergies as exacerbated by MCAS. (*Id.* ¶¶ 4, 38–40; Dkt. 38-8 at 1; Dkt. 38-9 at 1; *see* Dkt. 38-1 ¶ 29.) In other words, a reasonable factfinder could deem "unworthy of credence" Defendant's nondiscriminatory justification for banning Plaintiff based on "weaknesses, implausibilities, inconsistencies, incoherencies, [and] contradictions" supported by the record. *See Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997).

Because issues of fact concerning whether Defendant denied Plaintiff the full and equal enjoyment of its properties on the basis of her disabilities and whether Defendant's proffered nondiscriminatory basis for banning Plaintiff is pretextual remain, summary judgment on count one is improper. *See Campbell v. Moon Palace, Inc.*, No. 11-60274-CIV, 2011 WL 6951846, at *3, 2011 U.S. Dist. LEXIS 151402, at *11 (S.D. Fla. Dec. 15, 2011) ("[The p]laintiff's deposition testimony is sufficient evidence to survive summary judgment on the claims relating to [the alleged] barriers based on [the d]efendant's arguments that [he] was not denied full and equal use of [its] facility, that the alleged barriers did not affect him personally, and that the alleged barriers did not actually prevent or imped his use of the facility. Any factual disputes surrounding these claims will be determined at trial."); *see also Kennedy v. Nat'l Career Fairs, Inc.*, Civil Action No. 1:18-CV-4655-RWS, 2020 WL 10181656, at *3–5, 2020 U.S. Dist. LEXIS 256452, at *6–12 (N.D. Ga. July 22, 2020) (denying a defendant's summary judgment motion regarding a Title III discrimination claim when the defendant did not dispute the plaintiff's disability or the defendant's public

accommodation status, and explaining that factual disputes remained as to whether the plaintiff was denied full and equal enjoyment based on her disability); *Access 4 All, Inc. v. Atl. Hotel Condo. Ass'n*, No. 04-61740-CIV-COHN, 2005 WL 5632057, at *7–8, 2005 U.S. Dist. LEXIS 41600, at *22–24 (S.D. Fla. Aug. 17, 2005) (rejecting the defendant hotel companies' argument that the plaintiffs were not denied full and equal treatment based on the disabled plaintiff's disability, and denying summary judgment "based upon [that p]laintiff's testimony of his experience" at the hotel).

## B. Count Two

Count two alleges Defendant's interference, coercion, or intimidation of Plaintiff in violation of the ADA's anti-interference provision. (Dkt. 1 ¶¶ 67–71.) The ADA prohibits a person from "coerc[ing], intimidat[ing], threaten[ing], or interfer[ing] with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, . . . any right granted or protected by" the ADA. 42 U.S.C. § 12203(b). The Eleventh Circuit has "not yet had occasion to explain the proper standard for evaluating" a claim based on this provision. *Atchison v. Bd. of Regents of Univ. Sys. of Ga.*, 802 F. App'x 495, 508 (11th Cir. 2020); *accord Miller-Brown v. RV Behav., LLC*, No. 1:23-cv-04608-ELR-JEM, 2025 WL 4058264, at *9 (N.D. Ga. June 26, 2025) ("The Eleventh Circuit has not squarely addressed the proper standard for an ADA interference claim." (quotation omitted)), *report and recommendation adopted by* 2025 WL 4056843, at *11 (N.D. Ga. Aug. 19, 2025). However, persuasive authority supports that to prevail on an ADA interference claim, a plaintiff must satisfy three elements: (1) "the plaintiff exercised a right protected by the ADA," (2) "the

defendant coerced, intimidated, threatened, [or] interfered with the plaintiff's enjoyment of his or her ADA rights," and (3) "the defendant's actions were motivated because the plaintiff exercised a right protected by the ADA." *Callahan v. Emory Healthcare, Inc.*, No. 1:21-cv-1367-WMR-JSA, 2022 WL 18927486, at *14 (N.D. Ga. Nov. 10, 2022) (alterations adopted) (quoting *Mosley v. AM/NS Calvert, LLC*, No. CV 1:20-00517-KD-M, 2022 WL 843773, at *8 (S.D. Ala. Mar. 21, 2022)), *report and recommendation adopted by* 2023 WL 2334987, at *10 (N.D. Ga. Feb. 16, 2023), *aff'd*, No. 23-10604, 2024 WL 3027684, at *9 (11th Cir. June 17, 2024). Persuasive authority also supports that the ADA's anti-interference provision prohibits only "discriminatory conduct that is so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her ADA rights." *Mosley*, 2022 WL 843773, at *9 (alteration adopted and emphasis and quotation omitted).[2]

Defendant contends that its purported misconduct is insufficiently severe or pervasive to cause reasonable individuals to abandon the exercise of their ADA rights because Defendant exceeded its obligations under the ADA when accommodating Plaintiff's requests and because Plaintiff did not abandon the exercise of her ADA rights. (Dkt. 33 at 24–25.) Defendant further maintains that the trespass "could not have served as a threat or coercion to make [Plaintiff] abandon her rights" because "at that point[,] she was not even going to be permitted" on Defendant's properties. (*Id.*

---

[2] Plaintiff argues that a severe or pervasive conduct requirement has "no place in a retaliation claim," (Dkt. 37 at 16), and cites caselaw on retaliation, (*id.* at 16–17). However, Plaintiff sues for interference under 42 U.S.C. § 12203(b), not for retaliation under 42 U.S.C. § 12203(a). (Dkt. 1 ¶¶ 67–71; *see* Dkt. 39 at 6 n.3.) Indeed, the complaint does not mention retaliation. (*See* Dkt. 1.)

at 25.)  Additionally, Defendant argues, Plaintiff cannot establish that it acted out of animus toward her requests for accommodation.  (*Id.*)  In response, Plaintiff asserts that Defendant committed actionable misconduct when it did the following: "refus[ed] to adjust the air conditioner in October 2022 and [told her] that if she did not like the temperature in the room, she was free to leave the hotel and never return," informed her "in April 2023 that her air conditioning needs could not be guaranteed" even though the accommodation was medically necessary, failed to "adjust[] the air conditioning upon her arrival on May 17, 2023," directed its resort employees to follow her and monitor her, "denied [her] the ability to access a restaurant with an ECV," "denied [her] Club Level access," "designated [her] a . . . problem guest," and through the trespass, removed her and banned her from all of Defendant's properties. (Dkt. 37 at 18.)

As indicated above, evidence supports each of Plaintiff's assertions as to Defendant's actions.  (*See, e.g.*, Dkt. 33-1 at 39; Dkt. 38-1 ¶¶ 8–11, 15–25, 27–28, 30–33, 35–40; Dkt. 38-4 at 1; Dkt. 38-6 at 1; Dkt. 38-8 at 1; Dkt. 38-9 at 1; Dkt. 38-11 at 13–14.)  The court cannot conclude as a matter of law that Defendant's conduct fails to meet the requisite level of severity or pervasiveness, as the conduct—at least collectively—could "caus[e] a protected person to abandon the exercise of his or her ADA rights."  *See Mosley*, 2022 WL 843773, at *9; *see also Brown v. State Farm Mut. Auto. Ins. Co.*, 770 F. Supp. 3d 1355, 1370 (N.D. Ga. 2025) (denying summary judgment on an ADA interference claim in the employment discrimination context because "overly scrutiniz[ing the p]laintiff's restroom break[s]" and "once follow[ing

her] to the restroom while timing her" could "constitute interference"); *cf. Collins v. DeKalb County*, No. 1:24-cv-1252-LMM-CMS, 2026 WL 623676, at *21, 2026 U.S. Dist. LEXIS 2454, at *48–49 (N.D. Ga. Jan. 7, 2026) (recommending denying summary judgment in an employment discrimination case and explaining: "[T]here is evidence giving rise to factual issues related to [the plaintiff's] interference claim, including, for example, whether [the d]efendant interfered with [his] ADA rights when (1) [a supervisor] publicly scolded [him] for not returning to the office five days a week while [his] accommodation request was pending and told [him] that he was required to return to the office because the [chief executive officer] had ordered everyone to return to work in person and (2) [the d]efendant put [the plaintiff] in the tricky position of having to provide either proof of his medical restrictions to continue to pursue his ADA accommodation request or a release from a doctor clearing him to return to work full duty without any restrictions.  Upon consideration, a reasonable jury might find that such conduct could cause a reasonable person to abandon his ADA rights." (cleaned up)), *report and recommendation adopted by* 2026 WL 623676, at *5, 2026 U.S. Dist. LEXIS 44955, at *14–15 (N.D. Ga. Feb. 27, 2026).

Further, given the evidence of pretext in the record, (*see, e.g.*, Dkt. 38-1 ¶¶ 4, 29, 38–40; Dkt. 38-8 at 1; Dkt. 38-9 at 1), a reasonable factfinder could regard Defendant's actions as part of a strategy to get Plaintiff to leave Defendant's properties and could deem the strategy to be motivated by Defendant's desire to avoid further accommodating Plaintiff's disabilities.  The extent to which Defendant complied with the ADA with respect to Plaintiff's requests for accommodation remains to be

determined, as does the issue of whether Defendant used a pretext to justify discriminating against Plaintiff in violation of the ADA, including by banning her from its properties based on her disabilities. For the above reasons, Defendant is not entitled to summary judgment as to count two.

## CONCLUSION

Accordingly, Defendant's motion for summary judgment (Dkt. 33) is **DENIED**.

**ORDERED** in Orlando, Florida, on March 30, 2026.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record